MOUNT CLEMENS HARNESS ASSOCIATION *v.*
RACING COMMISSIONER.

1. LICENSES—SUPREME COURT.

The Supreme Court does not superimpose its judgment over a licensing officer who denies a license to an applicant but confines itself to a determination of whether there was a reasonable ground sustaining the determination.

2. SAME—RACING—BASES FOR DENIAL.

Racing commissioner's denial of a license to construct and operate a harness race track *held*, reasonable, where denial stated that plans submitted called for a track that was inadequate to handle normal crowds in the area making it probable the construction and operation would result in loss of revenue to the State and to the horsemen, the applicant did not have control of all of the proposed site, plans submitted were not in sufficient detail to permit thorough anaylsis, close proximity of track to air force base was an undesirable factor, and financial responsibility was not shown.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 33 Am Jur, Licenses § 60.
[3] 42 Am Jur, Public Officers §§ 20, 21.
[4] 34 Am Jur, Mandamus § 16.
[5] 28 Am Jur, Injunctions § 20.
[6] 33 Am Jur, Licenses § 84.
[7] 28 Am Jur, Injunctions § 299.

3. OFFICERS—STATE RACING COMMISSIONER.
    The State racing commissioner is a State officer.

4. MANDAMUS—STATE OFFICER—CIRCUIT COURT.
    A circuit court does not have jurisdiction to issue a writ of mandamus against a State officer (CL 1948, §§ 606.1, 636.3).

5. SAME—STATE OFFICER—CIRCUIT COURT.
    A writ of mandamus to compel the State racing commissioner to issue a race track license may not be obtained from a circuit judge under the guise of a mandatory injunction (CL 1948, §§ 606.1, 636.3).

6. LICENSES—RACE TRACKS—STATUTES.
    A statute prohibiting the licensing of more than 3 race tracks in a city area having a population of 1,000,000 or more and which clearly prohibited a race meet at site proposed by applicant for license would refer to the status when application is made (PA 1959, No 27, § 8, subd 4).

7. COSTS—PUBLIC QUESTION—RACE TRACK LICENSE.
    No costs are allowed on appeal from order of circuit court granting mandatory injunction to compel State racing commissioner to issue license to applicant for construction and operation of a race track, a public question being involved.

Appeal from Macomb; Kane (Edward T.), J., presiding. Submitted April 14, 1960. (Docket No. 62, Calendar No. 48,284.) Decided July 11, 1960.

Bill by Mount Clemens Harness Association, a Michigan corporation, against Michigan Racing Commissioner, a State administrative officer, to review determination denying license to construct and operate harness race track. Decree for plaintiff. Defendant appeals. Reversed.

*Maurice A. Merritt,* for plaintiff.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *Gerald David White* and *Wilbur DeYoung,* Assistants Attorney General, for defendant.

KELLY, J.   Defendant (Michigan racing commissioner) appeals claiming that "the lower court erred in ruling that the racing commissioner had abused his discretion in denying appellee a race track license for harness racing" and "in issuing a decree which is in effect a writ of mandamus against the appellant racing commissioner who is a State officer."

Defendant also claims the issue is moot because of the enactment of PA 1959, No 27, which provides in section 8, subd 4 (CL 1948, § 431.38 [Stat Ann 1959 Cum Supp § 18.966(8)]), as follows:

"In a city area, there may be licensed not more than 3 tracks.  A city area includes any city having a population of 1,000,000 or more, according to the latest or each succeeding Federal decennial census, and includes the counties wholly or partly within a distance of 30 miles of the city limits of such city."

The proposed race track site is located within the borders of the city of Mt. Clemens and the townships of Clinton and Harrison, and is approximately 14 miles from the Detroit city limits and 21 miles from the Detroit city hall.  The greater portion of the site is located in Clinton township, and the Clinton township board adopted a resolution opposing the establishment of the track.  The city of Mt. Clemens and Harrison township took no action approving or disapproving.  Opposing the establishment of the track, the commissioner received petitions bearing 759 names and 159 letters and postcards.  He received 32 letters and 3 telegrams for establishing the track.

In denying the application, the commissioner, in commenting upon the failure to obtain approval of local governing bodies having jurisdiction over this site, stated:

"Although the State racing act makes no mention of approval or disapproval of proposed race tracks

by local units of government, it is the opinion of the racing commissioner that such approval is an essential to a successful racing operation and that the lack of such approval by any of the 3 units concerned with the present application is a serious defect in the application.    This is especially true since fire and police protection and traffic control are of vital importance in the operation of a race meeting.    *    *    *

"Before any track application could be approved at this site it would be necessary for 1 of 2 things to be accomplished, (1) annexation of the entire site by Mount Clemens together with assurances that the city would extend full police and fire protection and water and sewer services to the proposed track, or (2) a firm agreement between the racing association and the 3 governmental units specifying the contribution of each for a specified period of time of fire and police protection and other necessary municipal services and also outlining in detail the exact division of the parimutuel rebate money to each of the 3 governmental units involved."

Appellee's answer to the commissioner's point in this regard is as follows:

"Therefore, there appears no justifiable reason for the requirement that local governing bodies must give their approval as a condition precedent to the granting of a license.    On the subjects of vehicular traffic, fire prevention, fire fighting, sanitary facilities, et cetera, the interested municipalities have rights of regulation.    As to whether or not the subject site has or may procure adequate water and sewerage service, the applicant has the problem of securing such services in the same manner as it would if it were desiring to construct a theater, an industrial plant, a private school, et cetera."

In addition to the failure to obtain approval of local governing bodies, the racing commissioner assigned the following 5 reasons why he concluded

that it would be in the public interests or in the best interests of the harness sport to deny the application:

1. "Plans submitted call for a track that would be inadequate to handle normal harness racing crowds in Detroit area, making it probable that construction and operation of this track would result in loss of revenue to State and to the horsemen."

2. "Applicant does not presently control all of site on which it is proposed to construct racing plant."

3. "Plans submitted are not in sufficient detail to permit thorough analysis by racing commission."

4. "Close proximity of track to Selfridge air force base is an undesirable factor."

5. "The stock subscriptions submitted with the application together with the testimony of the large subscribers has not shown financial responsibility of the applicant racing association."

In finding that the applicant, Mount Clemens Harness Association, failed to show financial responsibility, the commissioner referred to the proof which disclosed that the large stock subscribers testified that it was their intention to perform various phases of the construction work on the racing plant rather than purchase stock for cash; that none of the subscribers had had any previous experience or interest in the harness sport, and several testified that their only interest in the track was as a prospective contractor and that, further, it would be necessary for them to obtain a line of credit from a bank in order to perform their work; that Mr. Keller, a general contractor, in May had subscribed for $600,000 but when he was called to testify on the final hearing (October 30th) the attorney for the association informed the commissioner that Mr. Keller had withdrawn his subscription due to pres-

sure from the church he attended which is opposed to race tracks with parimutuel wagering.

Fourteen "pre-incorporation agreements" were filed showing a total alleged subscription in the amount of $1,524,500. Keller's withdrawal reduced the amount by $600,000, and there was no replacement of this $600,000 in the stock subscription. Only 1 subscriber subscribed cash in the amount of $1,000, and no portion of this subscription was escrowed or paid in.

In endeavoring to satisfactorily establish the proposed financial structure, appellee stated the sum of $300,000 would be furnished by concessionaires but the record is devoid of any commitment in this regard.

The stock subscription form contained the following paragraph:

"That the funds and/or services pledged herein are, or will be wholly owned or provided by the undersigned and such funds and/or services have not, nor will they be furnished by another undisclosed person, firm or corporation, and no undisclosed person, firm or corporation will have any beneficial interest in any stock in the Mount Clemens Harness Association which is issued to the undersigned pursuant to this agreement."

In the midst of the appeal to the circuit court, the commissioner was advised by letter from attorney Walter H. Reynolds that 5 subscribers were withdrawing from participation in the Mount Clemens Harness Association, thus reducing the total subscription of stock from $924,500 to $114,500.

The commissioner in denying the application said:

"If the large subscribers who are the contractors performing work on the track have to obtain credit or loans in connection with completing their work on the track, it would seem logical that they would

have to pledge the race track stock in securing the credit or loans and thus would be in violation of the above quoted paragraph of the stock subscription form."

Appellee answers the commissioner by stating:

"The respondent states, in his reasons for denying the applicant's license to construct, that the petitioning association has failed to show financial responsibility because of the uncertainty that each stock subscriber would obtain a construction contract in the exact amount of his subscription, et cetera. Unless and until finalized plans and specifications are ready for use, it could not be known how much wood, cement, steel, electrical wiring, paint, et cetera, would be used in the construction of such track and necessary buildings and grandstand.
\* \* \*

"In concluding the argument on this issue, it appears that the legislators did not intend that an applicant for the subject license have a financial worth or standing of any specific grade or level merely to construct a track, but only to conduct a racing meet."

In regard to the close proximity of the track to Selfridge air force base, appellant stresses the fact that the record discloses the proposed track would be located in a direct line with the east-west runway of Selfridge air force base and the grandstand would be about 4,650 feet from the west end of the runway. Appellant further states: "A track at the proposed site would be clearly contrary to the recommendations of the President's airport commission, commonly known as the Doolittle commission."

The commissioner's finding that the applicant does not control all of the site on which it is proposed to construct the racing plant, is based on the fact that "approximately one-third (22 acres) of the

proposed site is not presently owned or under option by the Mount Clemens Harness Association."

We do not superimpose our judgment over the commissioner—we do not decide or adjudicate on the premise that if we were racing commissioner we would have arrived at a different conclusion, but confine ourselves to a determination of whether there was reasonable ground sustaining the commissioner's decision. All we demand is that the causes assigned by the commissioner for refusing or granting the application be reasonable. See *Leach* v. *Racing Commissioner,* 340 Mich 202; *Hazel Park Racing Association, Inc.,* v. *Racing Commissioner,* 343 Mich 1.

There was reasonable ground sustaining the commissioner's finding that the application should be denied.

The circuit court decree provided in part:

"It is further ordered, that the defendant commissioner shall forthwith issue to the plaintiff a license to construct and maintain a harness racing plant on the proposed site in Macomb county, Michigan, in accordance with the plans and specifications submitted by the plaintiff, with full rights in and to said license as of the date of the filing of the bill for review herein."

In answering appellant's contention that the lower court erred in issuing a decree which is in effect a writ of mandamus against the appellant racing commissioner who is a State officer, appellee replies as follows:

"The reviewing court did not issue a writ of mandamus against the appellant commissioner, and could not have done so authoritatively. However, in order to finalize its review, it properly did more than reverse the findings and determination of the appellant; it went on to determine the substantial

rights of the petitioner by decreeing that the sought-after license should issue 'with full rights in and to said license as of the date of the filing of the bill for review.' Actually, petitioner's right in said license arose as at May 22, 1956, the date on which the appellant filed its application for subject license, and the lower court could have fixed that date, instead of the date of filing of the bill for review, as the date on which the appellant's rights in said license began.

"Had this appellant not appealed the decision now before this Supreme Court, the appellee would then be required to petition the Supreme Court for the issuance of the appropriate writ ordering the issuance of said license.

"In summarizing, the lower court reversed the findings of the racing commissioner and decreed the issuance of a license 'with full rights in and to said license as of the date of the filing of the bill for review,' (November 21, 1956); another way of stating that the petitioner was entitled to the subject license as at November 21, 1956."

The judicature act under the heading "Writs of Mandamus and Prohibition" reads:

"No circuit court shall have jurisdiction to issue a writ of mandamus against any State officer." (CL 1948, § 636.3 [Stat Ann § 27.2230].)

Also, section 1, chapter 6, entitled "Of the Jurisdiction and Powers of the Circuit Courts at Law and In Chancery," of the judicature act, reads in part:

"The said circuit courts within and for their respective counties, shall have and exercise original and exclusive jurisdiction, except as otherwise provided: * * *

"2. To issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari and ne exeat, and to hear and determine the same, provided that no circuit court shall have jurisdiction to issue the

writs of mandamus or quo warranto against State officers." (CL 1948, § 606.1 [Stat Ann § 27.542].)

In *Minarik* v. *State Highway Commissioner,* 336 Mich 209, a bill for mandatory injunction was filed. It was dismissed upon motion in the lower court. Plaintiff appealed and we affirmed. We there said (p 213):

"The bill, together with the testimony taken on the motion to dismiss, plainly shows that a mandatory injunction was sought against the State highway commissioner, an elected State officer, so as to secure a mandatory order equivalent to mandamus, ordering the State highway commissioner to clean out the ditch and remove all earth, weeds and obstructions and in so doing at least deepen it so as to restore its original condition when dug. It is estimated that the entire cost of giving plaintiffs the remedy they sought would be $300. It is not within our province to advise the remedy, if any, particularly in view of the uncertainties created by the record, nor do we elaborate on the possible injustice being done to plaintiffs if their theory is correct. The trial judge must adhere to the law, which provides that no circuit court has jurisdiction to issue a writ of mandamus against State officers. CL 1948, § 636.3 (Stat Ann § 27.2230). See *Lucking* v. *People,* 320 Mich 495; *Reed* v. *Civil Service Commission,* 301 Mich 137. Plaintiffs call our attention to other cases where the facts differ and where mandamus was not sought against a State officer. No litigant can mandamus a State officer in the circuit court simply by using the term injunction instead of mandamus when it is the latter remedy that he seeks. The circuit judge correctly held that plaintiffs were seeking a mandamus under the guise or misnomer of a mandatory injunction."

See, also, *Schobert* v. *Inter-County Drainage Board,* 342 Mich 270; *Thompson* v. *Auditor General,* 261 Mich 624; *Chemical Bank & Trust Co.* v. *County*

*of Oakland,* 264 Mich 673; and *Reed* v. *Civil Service Commission,* 301 Mich 137.

The lower court erred in decreeing "that the defendant commissioner shall forthwith issue to the plaintiff a license to construct and maintain a harness racing plant."

A matter of a few hours on the same day (May 7, 1959) elapsed between the time that the decree appellee relies upon came into existence and the signing by the governor of Enrolled House Bill No 51, which became PA 1959, No 27, and was given immediate effect. The legislative mandate clearly prohibits a race meet at appellee's site, as there are already 3 tracks in this area. Appellee does not refer to its status when application is made (which appellee admits must be made) to conduct a race meet at a site prohibited by law.

The decree entered in the lower court is reversed and the findings of appellant racing commissioner affirmed. No costs, a public question involved.

DETHMERS, C. J., and CARR, SMITH, BLACK, EDWARDS, KAVANAGH, and SOURIS, JJ., concurred.